**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| Kinetiq, Inc., <br><br> *Plaintiff,* <br><br> v. <br><br> CCR Media, LLC, and <br> Circle Computer Resources, Inc., <br><br> *Defendants*. | Case No. 1:26-cv-162 |

### VERIFIED COMPLAINT

Plaintiff Kinetiq, Inc. ("Kinetiq"), by and through undersigned counsel, hereby brings claims against Defendants CCR Media, LLC ("CCR") and Circle Computer Resources, Inc. ("Circle") (collectively CCR and Circle may hereinafter be referred to as "Defendants"), and alleges as follows:

## I.  INTRODUCTION

1.  This is a case of CCR misusing Kinetiq's confidential information to harm Kinetiq for financial gain. It is also a case of CCR unlawfully breaching contracts for supplying business-critical services in the hope of gaining Kinetiq's customer, Nielsen, for itself. And, it is a case of CCR baselessly alleging patent infringement, of a patent Kinetiq has never used or infringed in any manner, as a ruse for CCR's breach of contract and tortious interference with Kinetiq's contract and beneficial relationship with Nielsen.

2.  Kinetiq is in the "media intelligence" business. That means Kinetiq analyzes TV signals to provide its clients with insights about what is being broadcast.

3. To run its business, Kinetiq needs access to the TV signals themselves. While Kinetiq has a large network of hardware for acquiring TV signals around the world, its rapid growth required it to purchase TV signals from CCR in Canada, an area where Kinetiq's business is rapidly expanding. Kinetiq and CCR signed a First Non-Disclosure Agreement (First NDA) in 2023, a Master Services Agreement (MSA), and a series of Statements of Work (SOWs) for specific broadcast collections over specific time periods. A copy of the First NDA is attached as Exhibit "1." A copy of the MSA is attached hereto as Exhibit "2." Examples of SOWs are attached as Exhibits "3A" through "3F."

4. Kinetiq's vast network of hardware is valuable to others in the media intelligence space, including The Nielsen Company and its famous "Nielsen Ratings." Previously, Nielsen relied extensively on CCR for media signals, but, more recently, Nielsen has started reducing its use of CCR and increasing its reliance on Kinetiq.

5. While Nielsen has recently provided Kinetiq with significant revenue, like a scorned ex-lover, CCR has been unhappy with the reduction of its own business dealings with Nielsen, and Nielsen's concomitant increased use of Kinetiq's services.

6. In early 2025, CCR expressed interest in acquiring Kinetiq, and, at the time, Kinetiq believed the offer was sincere and in good faith. In anticipation of a possible acquisition, the parties signed a Second NDA, pursuant to which Kinetiq provided CCR with substantial confidential information, with the contractual promise that those secrets would be used exclusively for CCR to consider a possible acquisition of Kinetiq. This confidential information included sales and revenue projections from which, on information and belief, CCR was able to infer that the business CCR was losing with Nielsen was going to Kinetiq. A copy of the Second NDA between Kinetiq and CCR is attached as Exhibit "4."

2

7. Upon learning that Kinetiq was taking its business, CCR retaliated. It breached its business-critical SOWs with Kinetiq by recently announcing it was terminating all of them early and immediately on 30 business days' notice; it falsely accused Kinetiq of infringing U.S. Patent No. 10,555,037 ("the '037 patent") as a phony ruse for the improper termination; and then, in an attempt to interfere with Kinetiq's relationship with Nielsen, sent a threatening letter to Nielsen directly, falsely alleging that Nielsen's use of Kinetiq's services constituted an infringement of the '037 patent. A copy of the CCR termination letter (the "Termination Letter") to Kinetiq is attached as Exhibit "5," and a copy of the CCR letter threatening Nielsen (the "Tortious Interference Letter") is attached hereto as Exhibit "6."

8. The timing of these actions, as well as other events described below, point to the inescapable conclusion that CCR was able to take these steps by, *inter alia*, using Kinetiq's confidential information it learned through the acquisition discussions—information it was prohibited from using for any purpose other than to evaluate the acquisition of Kinetiq. Instead, CCR used restricted information to lash out at Kinetiq and Nielsen in flagrant breach of the First and Second NDA, and an improper attempt to interfere with Kinetiq's relationship with Nielsen.

9. The patent infringement accusation is, and always has been, baseless. The '037 patent claims a method of ***automatically*** switching TV channels when the current channel does not match the latest channel information from the broadcaster. CCR never had any reason to believe that Kinetiq's monitoring devices updated channels automatically—because they do not. A copy of the '037 patent is attached as Exhibit "7."

10. Moreover, the alleged inventions of the '037 patent are not even patentable or even patent eligible. The '037 patent simply describes the age-old idea that when Mediacom changes your favorite program from channel 36 to channel 45, you change the channel too. All the '037

3

patent added was the abstract instruction to "automate that." That is not patent eligible subject matter; it is not novel; and it is not nonobvious. Prevailing case law makes clear that such patents are invalid.

11. Kinetiq now seeks an immediate injunction to stop CCR from: (i) wrongfully terminating Kinetiq's business-critical contracts before they expire; (ii) tortiously interfering with Kinetiq's relationship with its major client, Nielsen; and (iii) unlawfully using Kinetiq's confidential information against it. Kinetiq also seeks a declaration that it does not infringe the '037 patent and that the '037 patent is invalid. The bases for these and other items of relief to which Kinetiq is entitled are set out below.

## II. PARTIES

12. Kinetiq is a Delaware corporation with its principal place of business in Conshohocken, Pennsylvania.

13. CCR is an Iowa LLC with its principal place of business in Cedar Rapids, Iowa.

14. On information and belief, CCR's members are all Iowa corporations or Iowa LLCs whose members are in turn Iowa corporations. All of these business entities have their principal place of business in Cedar Rapids, Iowa.

15. Circle is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa.

## III. JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), and 1367(a) because:

a. Kinetiq's claims for declarations of patent noninfringement and invalidity "aris[e] under an[] Act of Congress relating to patents," § 1338(a); and

b. Kinetiq's claims for breach of contract and tortious interference arise out of the same operative facts as Kinetiq's patent claims.

17. This Court additionally has subject matter jurisdiction under 28 U.S.C. § 1332(a) because:

a. Plaintiff Kinetiq is a citizen of Delaware and Pennsylvania, and on information and belief, Defendants CCR and its members, as well as Circle, are citizens of Iowa;

b. The amount in controversy exceeds $75,000, including that Kinetiq seeks an injunction that would affect contracts with a value in excess of $75,000.

18. This Court has personal jurisdiction over CCR because CCR has its principal place of business in Iowa and CCR consented to jurisdiction in this Court in the MSA.

19. This Court has personal jurisdiction over Circle because Circle has its principal place of business in Iowa.

20. Venue is proper in this District because CCR consented to venue in the Northern District of Iowa in the MSA, and all Defendants reside in this District.

## IV. FACTS

### A. Kinetiq Provides Media Intelligence for its Clients

21. Kinetiq provides its clients with media intelligence services—distilling information from numerous television channels to produce meaningful insights to customers whose businesses hinge on understanding news, publicity, and marketing. For example, some of Kinetiq's clients use Kinetiq's services for market research to better understand their investments and the economy.

22. Kinetiq's services depend on access to the television signals it analyzes. Those TV signals are the lifeblood of Kinetiq's business—cut them off, and the business is in imminent peril.

5

**B.    Kinetiq Contracts with CCR for TV Signals in Some Areas**

23.    Although Kinetiq controls much of its own capturing hardware for TV signals, its rapid growth has also led it to partner with others, such as CCR, to receive TV signals in expanding areas.

24.    In 2023, Kinetiq and CCR started exploring a partnership for CCR to supply TV signals for Kinetiq's growing business in Canada.

25.    Kinetiq's relationship with CCR was memorialized in a series of agreements: the First NDA, the MSA, the SOWs, and the Second NDA. Exhibits 1, 2, 3, and 4, respectively.

*(1)    The First NDA*

26.    In preparation for their business relationship, Kinetiq and CCR signed a non-disclosure agreement on August 23, 2023 (Exhibit "1," the "First NDA").

27.    Information shared between the parties and not otherwise public or rightfully known by the recipient was deemed "Confidential Information," and the recipient was obligated to safeguard Confidential Information and not use Confidential Information for any purpose other than evaluating the planned business relationship. Ex. 1, First NDA §§ 1-2.

28.    It was further agreed by the Parties that due to the First NDA's "unique subject matter" and "the difficulty of measuring damages" from a breach, either party enforcing the agreement would "have the right (without the necessity of posting bond) to have all agreements and covenants of [the First NDA] specifically performed by the [other] party, and to obtain preliminary and permanent injunctive relief to secure specific performance, and to prevent a breach or contemplated breach, of [the First NDA]." Ex. 1, First NDA § 6.

6

*(2)  The MSA*

29.  On August 30, 2023, Kinetiq and CCR executed a Master Services Agreement (MSA) for CCR to provide Kinetiq with certain collocation and content monitoring services. A copy of the MSA is attached hereto as Ex. 2.

30.  As described below, the MSA: (1) prevented statements of work (SOWs) from being terminated early except for uncured material breach; (2) protected confidential information including "Client lists"; (3) ensured that each party could seek injunctive relief to cure what was agreed would be irreparable harm from a breach of these provisions; and (4) provided for attorneys' fees for the prevailing party in litigation. Ex. 2, MSA §§ 3.4, 5.1, 5.2, 7.1, 7.2.

31.  The MSA reaffirmed the Parties' confidentiality obligations: either party receiving "Proprietary Information" would not "use, directly or indirectly, any of the Disclosing Party's Proprietary Information for any purpose that is in any way detrimental to the Disclosing Party." MSA § 3.2. "Proprietary Information" was defined to include "Confidential Information," which in turn included "Client lists" and "identity of vendors and partners." Ex. 2, MSA § 3.4.

32.  Work under the MSA was agreed to be performed as a series of Statements of Work (SOWs), and each SOW was agreed to "continue[] for the term specified in the Statement of Work, unless terminated earlier as provided" in the MSA. Ex. 2, MSA § 7.1.

33.  The only specified ground for early termination of an SOW was a "material default" not cured within thirty days. A material default could include, among other things, a material breach of the MSA or SOW, a violation of a term related to intellectual property or proprietary information, or failure to pay on time. Ex. 2, MSA § 7.2.

34.  Kinetiq and CCR agreed that breaching one of these provisions "may cause the other [party] irreparable harm without an adequate remedy at law" and therefore "agree[d] that the

7

other Party may seek temporary or permanent injunctive relief to prevent or limit the effect of any such breach." Ex. 2, MSA § 5.1.

(3)     The SOWs

35.     After executing the MSA, Kinetiq and CCR entered into a number of SOWs for CCR to provide Kinetiq with TV signals. *See* Exhibits 3A through 3F.

36.     As specified in the MSA, CCR could not terminate these SOWs as it pleased. Only an uncured material default under the parties' contracts could justify termination.

37.     As an example, on November 28, 2024, Kinetiq and CCR signed an agreement for the provision of collocation and content monitoring services in Sudbury, Ontario and Vancouver, British Columbia (the "November 2024 SOW" attached hereto as Exhibit "3A").

38.     The November 2024 SOW provided for CCR to monitor fourteen television channels and specified the supporting infrastructure that would be used.

39.     The term of the November 2024 SOW was agreed to run for 36 months from the first monthly bill. The November 2024 SOW is supposed to remain in effect and not expire until November 2027.

40.     Kinetiq signed several other SOWs with CCR that are potentially at issue in this case, including, but not limited to:

a.      Quote #013026v1 – BallySports Channel Addition, starting January 2024, and not due to expire until January 2027. Attached hereto as Exhibit "3B."

b.      Quote #013280v1 – Canada Expansion Phase 1 – 46 channels, starting November 2024 and not due to expire until November 2027. Attached hereto as Exhibit "3C."

c.      Teletrax – 1 Channel Add Canada, starting March 2024 and not due to expire until March 2027. Attached hereto as Exhibit "3D."

8

d.      Teletrax – Additional VM (Canada) Radio MW, starting December 2024 and not due to expire until December 2027. Attached hereto as Exhibit "3E."

e.      Teletrax – 1 Channel Add Canada – Cottage Life, starting May 2026 and not due to expire until May 2027. Attached hereto as Exhibit "3F."

41.     As set forth in the MSA, these SOWs, Exhibits 3A-3F cannot be terminated by CCR except for "material default."

42.     Immediate and unwarranted termination of these SOWs will result in immediate and irreparable harm to Kinetiq, which damages cannot cure.

**C.      Kinetiq Enters a Major Partnership with Nielsen, Outcompeting CCR for Some Business**

43.     The Nielsen Company, known for its famous "Nielsen Ratings" of TV viewership, needs media signals to determine what programs viewers are watching.

44.     For years, Nielsen had contracted with CCR to provide media signals for Nielsen's analytics.

45.     But by 2024, Nielsen was unhappy with CCR's pricing and services and was looking for alternatives.

46.     So, Nielsen approached Kinetiq, and, following lengthy technical discussions, Nielsen decided to replace some of CCR's services with Kinetiq's.

47.     In April 2026, Nielsen and Kinetiq signed a contract for Kinetiq to supply Nielsen with media signals.

48.     CCR became aware that Nielsen was starting to purchase fewer of CCR's services and that its contracts with Nielsen were not being renewed as anticipated.

49.     On information and belief, Nielsen did not tell CCR the identity of Nielsen's new supplier—i.e., Kinetiq.

9

50. However, subsequent activities confirm that CCR surreptitiously learned that Nielsen's new supplier was Kinetiq. On information and belief, CCR learned this, *inter alia*, from improperly obtaining confidential information during CCR's unlawful "fishing" campaign that it conducted during its disingenuous "acquisition" discussions, as detailed below.

**D. CCR Feigns Interest in Acquiring Kinetiq and Receives Substantial Confidential Information Subject to a Second NDA**

51. In early 2025, CCR claimed to be interested in acquiring Kinetiq. Kinetiq believed at the time that CCR's interest was sincere.

*(1) The Second NDA*

52. To facilitate possible sale discussions, the parties on February 25, 2025 signed an agreement for CCR to keep Kinetiq's information confidential and only use it to evaluate a potential acquisition (the "Second NDA" attached hereto as Exhibit "4").

53. Specifically, the Second NDA designated the information to be shared in sale discussions as "Evaluation Material," and provided that CCR could "use the Evaluation Material solely for the purpose of evaluating the Transaction" and must "keep the Evaluation Material confidential[.]" Ex. 4, Second NDA ¶ 1.

54. CCR also agreed in the Second NDA that "damages would not be a sufficient remedy" for breach and Kinetiq "shall be entitled to equitable relief, including in the form of injunctions and orders for specific performance, in addition to all other remedies available to [Kinetiq] at law or in equity." Ex. 4, Second NDA ¶ 7.

*(2) Information Shared Pursuant to the Second NDA*

55. Because Kinetiq believed that CCR was approaching the sale discussions in good faith, Kinetiq shared the type of highly sensitive business information that is necessary to evaluate a transaction of that magnitude.

56. While Kinetiq did not disclose the name "Nielsen," Kinetiq shared information about its major upcoming contracts and revenue streams that, on information and belief, allowed CCR to draw the inference that Nielsen was one of Kinetiq's major new clients—and that Kinetiq, being one of the few providers in the industry, must have filled CCR's lost business in supplying Nielsen with media signals.

57. That information was covered by the Second NDA. CCR could not lawfully use it for *any purpose* other than the sale evaluation.

**E.      CCR Retaliates over Kinetiq's Nielsen Contract**

58. By June 2026, on information and belief, CCR had learned that Kinetiq was taking CCR's lost business with Nielsen. So, CCR decided to retaliate.

*(1)      Unlawfully Terminating the SOWs*

59. On June 16, 2026, CCR sent Kinetiq a letter purporting to terminate the MSA and all SOWs under it "for cause." A copy of the June 16, 2026 Termination Letter is attached hereto as Exhibit "5."

60. The Termination Letter indicates that CCR will stop performing services for Kinetiq after the MSA's 30-business-day cure period, which will end on or around July 31, 2026. CCR stated in a subsequent letter that it believed the termination date would occur on August 4-5, 2026, and that all contracts would terminate at that point.

61. The SOWs CCR stated it would terminate included ones whose term would not end until late 2027.

62. CCR had no right to terminate any of these SOWs early. Their fixed time period was a bargained for protection to ensure the continuity of Kinetiq's business.

63. The purported reason for termination was CCR's unfounded accusation that Kinetiq was infringing U.S. Patent No. 10,555,037 (the "'037 patent"), currently assigned to Circle.

64.     As explained below, that accusation was baseless: Kinetiq does not infringe the '037 patent, and CCR had no good faith reason to believe that it did, nor has CCR provided any evidence of any infringement.

65.     On information and belief, CCR knows that Kinetiq could not possibly provide services to all of its customers if CCR discontinues its services prior to the proper expiration of the SOWs.

66.     On information and belief, CCR also knows that the subject SOWs covered all or nearly all of Kinetiq's business operations in Canada and that pulling the plug could result in Kinetiq losing that entire market.

67.     For this reason, the factual record is overwhelming that CCR designed the June 16, 2026 Termination Letter to inflict maximum damage on Kinetiq's business as punishment for Kinetiq's arm's-length transactions with Nielsen.

*(2)     Unlawfully Threatening Nielsen with an Infringement Lawsuit*

68.     Attacking Kinetiq's own contract was not enough for CCR. CCR then attacked Kinetiq's major client—Nielsen—and falsely alleged that Kinetiq's activities—and by extension, Nielsen's—infringed the '037 patent.

69.     CCR's June 16, 2026 Tortious Interference Letter threatening Nielsen stated:

> This letter is to make you aware of a troubling situation. As you know, CCR is the owner of intellectual property rights associated with its products, including its active monitoring services in U.S. Patent No. 10,555,037 (" the '037 Patent"), a copy of which is attached. **While Nielsen has recently chosen to reduce its usage of CCR services**, we hope Nielsen will continue to respect CCR's intellectual property rights.
>
> As you know, CCR must protect its intellectual property. In that regard, CCR has learned that **Kinetiq is likely offering similar active monitoring services** [to Nielsen] that may infringe CCR's '037 Patent claims and CCR has sent to Kinetiq a letter demanding that they cease and desist use of CCR's patent technology. We look forward to resolving these issues with Kinetiq and ***hope Nielsen will not knowingly purchase any infringing***

12

*services from Kinetiq or otherwise contribute to Kinetiq's infringing activities*. Should you have any questions regarding the dispute between CCR and Kinetiq, please let us know.

Exhibit "6," Tortious Interference Letter (emphasis added).

70. The accusation of infringement was entirely false and baseless, and was intended solely to interfere with Kinetiq's contractual relationship with Nielsen.

71. Nielsen, as CCR predicted, was troubled by CCR's false allegations and immediately demanded that Kinetiq indemnify it against any claim by CCR for patent infringement.

**F.      CCR's Retaliation Imperils Kinetiq's Business and Threatens Immediate Irreparable Harm**

72. TV signals are the lifeblood of Kinetiq's business. Cut them off, and the business is in peril. It would be like cutting off electricity or water.

73. But that is just what CCR said it will do: cut off TV signals on SOWs that were months, if not over a year, from expiring.

74. It is impossible for Kinetiq to set up the necessary infrastructure and implement the services that CCR is terminating in the time between CCR's Termination Letter and the announced termination date.

75. That is why Kinetiq bargained for the protection of SOWs with defined termination dates, so that those services could not be taken away at CCR's whim.

76. It is also why Kinetiq bargained for the right to obtain injunctive relief if those terms were breached. *See* Ex. 2, MSA § 5.1.

77. If CCR is able to terminate Kinetiq's services, Kinetiq's client contracts will be broken or not renewed. Kinetiq's customers will no longer see Kinetiq as a reliable partner and look elsewhere. Kinetiq's reputation and goodwill will be irreparably damaged.

78. CCR knows that Kinetiq is 100% reliant on CCR for Kinetiq's growing business in Canada. On information and belief, that is why CCR chose this method of retaliation—because it would inflict maximum, irreparable damage.

79. Many of the SOWs CCR is threatening to terminate are essential for Kinetiq to honor commitments to major clients, the loss of which will seriously impact Kinetiq's business in ways that cannot be adequately quantified or restored.

80. Those major Kinetiq clients in turn have thousands of downstream clients, all of whom depend on Kinetiq's services. Thousands of businesses would be adversely affected by Kinetiq's services going dark.

81. When there is a gap in service, it cannot be filled after the fact. The information is permanently lost.

82. Kinetiq's major partnership with Nielsen is also under threat from CCR sending its baseless infringement accusation to Nielsen directly.

83. Absent an injunction and a declaration of noninfringement and invalidity from this Court, Kinetiq's reputation, value, and goodwill with Nielsen, its major clients, possible suitors and purchasers, and the public at large will be imperiled.

84. On information and belief, CCR is aware that Kinetiq is still looking for potential investors or purchasers and that CCR's accusation and its threat to Kinetiq's Canadian business will derail or impede any such conversations and make it virtually impossible to obtain the highest value for the company or its assets.

85. This damage cannot be repaired or quantified by monetary damages. The media analytics business is hotly competitive and rests on client relationships. Once those clients leave, they do not come back.

86. The damage would also be immediate. Indeed, it has already begun, as Nielsen has expressed concern to Kinetiq over the infringement threat.

**G.    CCR's Infringement Accusation Is Baseless**

87. The '037 patent issued on February 4, 2020 and is entitled Digital Media Receiver Monitoring System. A copy of the patent obtained from the United States Patent and Trademark Office ("USPTO") is attached as Exhibit "7." The '037 patent lists Mr. Phillip Kelly as the sole inventor and on its face is assigned to Circle Computer Resources, Inc.

88. Pursuant to the USPTO database, Circle—not CCR, the party threatening termination of services—is the assignee of the '037 patent.

89. The '037 patent contains 19 total claims. 18 claims are method claims. 1 claim is a system claim. The '037 patent contains 4 independent claims (1, 7, 13, and 19) and 15 dependent claims.

90. The patent describes the field of the invention as "digital media content monitoring." Ex. 7, col. 1:19-21. "More specifically, the invention comprises a way to detect connection parameter changes in a broadcast and uses this information to correct digital media receivers when a predetermined channel or stream has a lineup change." *Id.*

91. Claim 1 of the '037 patent is representative of the independent claims and recites:

> A method for monitoring one or more active receivers, the method comprising:
>
> providing one or more active receivers with connection parameters each for receiving a digital media input and providing a predetermined configured stream;
>
> providing a ***monitoring server*** for communicating with the one or more active receivers;
>
> providing an ***auditing receiver*** for querying from a connection parameter data source a current required connection parameters for each of the one or more active receivers;

wherein *the monitoring server* repeatedly communicates with the auditing receiver to query the current required connection parameters for each of the one or more active receivers and *compares the current required connection parameters to the connection parameters* for each of a corresponding one or more active receivers for *determining if re-connection of any of the one or more active receivers is necessary* to continue providing the configured stream, wherein connection parameters and current required connection parameters include information required to select a predetermined configured stream from the digital media input; and

*sending a command to re-connect from the monitoring server* to the corresponding one of the one or more active receivers if the current required connection parameters do not match the connection parameters.

Ex. 7, cols. 4:43-5:2 (emphasis added).

### (1)    *Kinetiq Does Not Infringe the '037 Patent*

92.    In Kinetiq's process, the determination as to whether a re-connection of any one of the active receivers is necessary *is performed by a manual comparison—not by the monitoring server claimed in the patent.* Kinetiq has a human—not a computer—review individual still frames and compare them with program guide information. If the still frame does not match what the human worker believes the TV program should look like, the worker will create a help ticket indicating that the receiver may need to be reconnected to the correct stream.

93.    A second human employee then reviews the help ticket to determine whether re-connection is in fact required. If so, that second employee logs into a different server from those previously discussed above where the human can cause the server to send an IR command to the receiver, which will retune the receiver to a different—and hopefully correct—channel.

94.    Kinetiq and its predecessor have been using the same techniques since prior to October 28, 2014, the earliest possible priority date for the '037 patent.

95.    Kinetiq's products and service do not infringe the '037 patent because Kinetiq uses a manual process over an automated process. More specifically, Kinetiq's products and services do not contain numerous elements as required by the claims of the '037 patent.

16

96. For example, Kinetiq's services and products do not infringe the '037 patent at least because they do not contain "a monitoring server." The patent requires that the monitoring server: (i) "repeatedly communicate[s] with the auditing receiver"; (ii) "compares the current required connection parameters to the connection parameters"; and (iii) "sends a command to re-connect."

97. Kinetiq's process does not do these three things: the server responsible for sending a reconnect command does not communicate with an "auditing receiver"; it does not compare connection parameters; and the decision of whether to reconnect is made by a human, and not a computer.

98. In addition, Kinetiq's services and products do not infringe the '037 patent at least because they do not utilize "connection parameters" as a basis for determining whether a reconnect is necessary. Instead, Kinetiq relies on third-party program data to do a visual match by a human in determining whether a single frame matches to the anticipated program.

99. Moreover, Kinetiq's services and products do not infringe the '037 patent at least because they contain no component which performs the function of "repeatedly communicat[ing] with the auditing receiver to query the current required connection parameters." Instead in Kinetiq's products and services, the server responsible for taking snapshots of the active connections places the snapshots in a database. But the server responsible for taking the snapshots does not "query the current required connection parameters." No device in the Kinetiq products or services is responsible for repeatedly communicating with another for the purpose of querying the current required connection parameters.

### (2) The '037 Patent Is Invalid

100. Furthermore, to the extent CCR's accusation of infringement covers Kinetiq's products and services, it necessarily covers a process that can be done manually.

17

101. Automation of a manual process is not patentable subject matter as a matter of fact and a matter of law.

**COUNT I: BREACH OF CONTRACT AS TO THE MSA AND SOWS**
**(KINETIQ V. CCR)**

102. Kinetiq realleges paragraphs 1 through 101 as if fully set forth herein.

103. Kinetiq and CCR executed a binding contract consisting of the MSA and several SOWs. The MSA is attached as Exhibit "2" and several examples of SOWs are attached as Exhibits "3A" through "3F."

104. The MSA and SOWs prohibited CCR from terminating any SOW early except for narrowly defined categories of "material default." Ex. 2, MSA § 7.2.

105. The MSA also prohibited CCR from using Kinetiq's confidential information "directly or indirectly … for any purpose that is in any way detrimental to" Kinetiq. Ex. 2, MSA § 3.2.

106. On June 16, 2026, CCR anticipatorily breached the MSA and the SOWs by:

a. Stating in the Termination Letter that it would terminate the MSA and SOWs on or before approximately July 31, and before their expiration, when cause for early termination does not exist;

b. Stating it would terminate the MSA and SOWs on or before approximately July 31, and without affording Kinetiq any real opportunity to cure any alleged default;

c. Stating it would terminate the MSA and SOWs without specifying a termination date as required in MSA § 7.2;

d. Using Kinetiq's confidential information to manufacture a ground for termination, in breach of MSA §§ 3.2 to 3.4;

e. Using Kinetiq's confidential information to make a baseless infringement accusation to Nielsen and thereby interfere with Kinetiq's contract with Nielsen;

f. Knowingly and unjustly tortiously interfering with Kinetiq's contract with Nielsen;

g. Using Kinetiq's confidential information to ascertain that Kinetiq was 100% reliant on CCR in Canada and that, therefore, cutting off service in Canada would inflict maximum damage.

107. Kinetiq has been damaged and irreparably harmed by CCR's breach of the MSA and SOWs, including by:

a. The threat to Kinetiq's business should CCR follow through with its stated intention to terminate the SOWs early;

b. The threat to Kinetiq's relationship with Nielsen from CCR's false accusation of infringement;

c. The threat to Kinetiq's ability to sell its stock or assets to any suitor by making false accusations of infringement;

d. The damage to Kinetiq's reputation from CCR's false accusation of infringement.

108. CCR's breach of the MSA and SOWs, if not enjoined, also threatens further imminent and irreparable injury, including:

a. An inability to maximize its value and attractiveness to any purchaser or potential purchaser of its assets or stock;

b. Loss of Kinetiq's contract with customers;

c. Loss of future business with customers;

19

d.     Loss of future business with other clients occasioned by even a temporary loss of the TV signals covered by the SOWs;

e.     Loss of future business with all client or potential clients occasioned by the reputational damage from CCR's false infringement accusation;

f.     Further irreparable damage to Kinetiq's reputation;

g.     Indemnification obligations to Nielsen under Kinetiq's April 1, 2026 contract with Nielsen.

## COUNT II: BREACH OF CONTRACT AS TO THE FIRST AND SECOND NDA'S (KINETIQ V. CCR)

109.   Kinetiq realleges paragraphs 1 through 101 as if fully set forth herein.

110.   On August 23, 2023, Kinetiq and CCR executed a binding contract consisting of the First NDA. *See* Exhibit "1."

111.   On February 25, 2025, Kinetiq and CCR executed a binding contract consisting of the Second NDA. *See* Exhibit "4."

112.   Both NDAs prohibited CCR from using information learned from Kinetiq for any purpose other than evaluating a business deal with Kinetiq. *See supra* ¶¶ 26-28, 52-54.

113.   All information CCR learned about Kinetiq's future contracts and revenue streams was confidential under the First NDA, the MSA, and/or the Second NDA.

114.   CCR breached the NDAs by:

a.     Using confidential information to manufacture an alleged patent infringement as an excuse for terminating the MSA and SOWs.

b.     Using confidential information to manufacture an alleged patent infringement as an excuse for threatening Kinetiq's contract with Nielsen.

c.      Using confidential information to ascertain that Kinetiq was taking CCR's lost Nielsen business and thus attempting to threaten Kinetiq's Nielsen contract as a means of winning back that business for itself.

115.    Kinetiq has been damaged by CCR's breach of the NDAs, including by:

a.      The threat to Kinetiq's business should CCR follow through with its stated intention to terminate the SOWs early.

b.      The threat to Kinetiq's relationship with Nielsen from CCR's false accusation of infringement.

c.      An inability to maximize its value and attractiveness to any purchaser or potential purchaser of its assets or stock;

d.      The damage to Kinetiq's reputation from CCR's false accusation of infringement.

116.    CCR's breach of the NDAs, if not enjoined, also threatens further imminent and irreparable injury, including:

a.      Further damage to Kinetiq's reputation.

b.      Loss of Kinetiq's contract with Nielsen.

c.      Loss of future business with Nielsen.

d.      Loss of future business with other clients occasioned by even a temporary loss of the TV signals covered by the SOWs.

e.      Loss of future business with all client or potential clients occasioned by the reputational damage from CCR's false infringement accusation.

f.      An inability to maximize its value and attractiveness to any purchaser or potential purchaser of its assets or stock;

21

g.      Indemnification obligations to Nielsen under Kinetiq's April 1, 2026 contract with Nielsen.

## COUNT III: TORTIOUS INTERFERENCE WITH A CONTRACT AND ADVANTAGEOUS BUSINESS RELATIONS
### (KINETIQ V. CCR)

117.    Kinetiq realleges paragraphs 1 through 101 as if fully set forth herein.

118.    On April 1, 2026, Kinetiq and Nielsen entered into a legally binding contract for Kinetiq to supply Nielsen with TV signals in exchange for payment.

119.    CCR knew that Kinetiq had a contract with Nielsen. On information and belief, CCR improperly acquired and used this information as a result of the confidential information supplied by Kinetiq pursuant to the First NDA, MSA, and/or Second NDA.

120.    Both Kinetiq and Nielsen have outstanding future obligations to each other under the April 1, 2026 contract, including that Kinetiq is obligated to continue supplying Nielsen with TV signals and Nielsen is obligated to continue paying Kinetiq for that service.

121.    On June 16, 2026, CCR tortiously interfered with Kinetiq's April 1, 2026 contract with Nielsen by intentionally and falsely telling Nielsen that Kinetiq was infringing the '037 patent and that Nielsen would be contributing to Kinetiq's infringement if it continued using Kinetiq's services. Ex. 6, Tortious Interference Letter.

122.    By sending the Tortious Interference Letter to Nielsen, CCR intended to interfere with Kinetiq's contract with Nielsen, and used improper means to do so.

123.    CCR's interference with Kinetiq's contract with Nielsen was improper, for reasons that include but are not limited to:

a.      CCR had no reasonable basis to allege infringement of the '037 patent.

22

b. CCR was not attempting to protect its intellectual property. It was attempting to force Kinetiq out of business in certain geographic areas so that it could reclaim business with Nielsen and other customers.

c. CCR was not attempting to compete by offering a superior product or better pricing. It was attempting to suppress competition through improper means including using confidential information and making false infringement accusations.

124. CCR's actions also tortiously interfere with Kinetiq's prospective business relations with Nielsen.

125. Kinetiq is progressing toward expanding its offerings to Nielsen. For example, Kinetiq is in discussions with Nielsen to provide media intelligence services that go beyond media signals.

126. Those discussions between Nielsen and Kinetiq about future business are well underway and likely to produce future business for Kinetiq in the near term.

127. But CCR's false infringement accusation threatens to chill Nielsen from engaging Kinetiq on any further business.

128. On information and belief, CCR knew that Kinetiq hoped to expand its business with Nielsen from revenue and contract projections shared confidentially pursuant to the Second NDA.

129. CCR intentionally sought to interfere with Kinetiq's future business with Nielsen by sending the Tortious Interference Letter to Nielsen falsely accusing Kinetiq of patent infringement.

130. CCR knew that Kinetiq is seeking investors or purchasers of its business. CCR knows that allegations of infringement against Kinetiq will impede and frustrate Kinetiq's ability to maximize any sale of its assets or stock to third parties.

131. Kinetiq has been harmed by CCR's tortious interference with its present and future business with Nielsen in ways that include, but are not limited to:

    a. Lost reputation and goodwill with Nielsen;

    b. The risk that Nielsen may terminate its April 1, 2026 contract with Kinetiq;

    c. The risk that Nielsen will not engage in further business with Kinetiq;

    d. The risk that third parties will not bid on, or offer a suitable price for Kinetiq's assets or stock.

132. If CCR's tortious interference is not enjoined, Kinetiq will suffer additional imminent and irreparable injury that includes, but is not limited to:

    a. Loss of the April 1, 2026 Nielsen contract;

    b. Loss of future business with Nielsen;

    c. Continued loss of reputation and goodwill with Nielsen;

    d. Indemnification under the April 1, 2026 contract;

    e. Price erosion of its assets or stock by purchasers or potential purchasers interested in buying those assets or stock;

    f. Loss of reputation and goodwill with other clients and prospective clients from CCR's false patent infringement accusation.

## COUNT IV: DECLARATORY JUDGMENT OF NONINFRINGEMENT
### (KINETIQ V. ALL DEFENDANTS)

133. Kinetiq realleges paragraphs 1 through 101 as if fully set forth herein.

134. An actual, continuing and justiciable controversy exists between Kinetiq on the one hand and Defendants CCR and Circle concerning the noninfringement of the '037 patent by Kinetiq's streaming media products and services. The actual, continuing and justiciable controversy is evidenced by CCR's letter terminating the MSA for cause on the sole ground that Kinetiq's services are performed in the same way and using the same systems as those employed by CCR and that CCR's products and services are covered by the '037 patent. In essence, in order for CCR to invoke the for cause termination clause of the MSA, it necessarily must argue that Kinetiq is infringing the patent.

135. As set forth above, Kinetiq does not infringe any valid and enforceable claim of the '037 patent.

136. CCR's pretextual infringement accusation of Circle's '037 patent as a basis for terminating the MSA for cause has caused an imminent and irreparable harm. Kinetiq will also suffer significant damages if CCR ceases to provide the contracted for services prior to their termination date because Kinetiq has obligations to its own clients that cannot be fulfilled without CCR performing its contractual obligations.

137. Under the Declaratory Judgment Act, Kinetiq requests a declaration that its products do not infringe any valid and enforceable claim of the '037 patent and therefore CCR may not rely on alleged infringement of the '037 patent to invoke "for cause" termination of the MSA.

### COUNT V: DECLARATORY JUDGMENT OF PATENT INVALIDITY
### (KINETIQ V. ALL DEFENDANTS)

138. Kinetiq realleges paragraphs 1 through 101 as if fully set forth herein.

139. An actual, continuing and justiciable controversy exists between Kinetiq on the one hand and Defendants CCR and Circle on the other hand concerning the invalidity of the '037

patent. The actual, continuing and justiciable controversy is evidenced by CCR's Termination Letter terminating the MSA for cause on the sole ground that Kinetiq's services are allegedly performed in the same way and using the same systems as those employed by CCR and that CCR's products and services are covered by the '037 patent. In essence, in order for CCR to invoke the for cause termination clause of the MSA, it necessarily must argue that the patent is valid in order for Kinetiq to infringe it.

140. All the claims of the '037 patent are invalid under at least 35 U.S.C. § 101 as directed to non-statutory subject matter.

141. Claim 1 of the '037 patent is directed to the abstract idea of collecting and analyzing information to determine when a media stream (like a TV channel) is tuned to the wrong channel and then tuning it to the right channel.

142. The claim recites receiving information, monitoring it, applying predetermined rules, and changing the channel if the results don't match. These activities are longstanding information-processing functions that can be performed mentally or through generic computer implementation.

143. The claim does not recite any improvement to computer technology, networking technology, database technology, or any other technological field.

144. The patent specification presumes that the claimed system works on conventional computer components, including generic processors, memory, and communication networks because it merely mentions servers and no specialized components or functionality.

145. Viewed individually and as an ordered combination, the claim elements merely implement the abstract idea using routine and conventional computer technology.

146. Accordingly, claim 1, and claims 2-19 for substantially the same reasons, are directed to patent-ineligible subject matter and are invalid under 35 U.S.C. § 101.

147. In addition, to the extent Defendants allege that Kinetiq's manual techniques infringe the '037 patent, Kinetiq and its predecessor have been using the same techniques since prior to October 28, 2014, the earliest possible priority date for the '037 patent.

148. All of the claims of the '037 patent are invalid at least under 35 U.S.C. §§ 102 and 103 as anticipated by or obvious in light of at least Kinetiq's own prior art.

149. Under the Declaratory Judgment Act, Kinetiq requests a declaration that the '037 patent is invalid and therefore CCR may not rely on alleged infringement of the '037 patent to invoke for cause termination of the MSA.

**PRAYER FOR RELIEF**

150. Based on the foregoing, Kinetiq seeks relief in the form of:

a. An injunction prohibiting CCR from terminating any and all SOWs before their stated expiration date;

b. An injunction prohibiting CCR from interfering with Kinetiq's contractual and business relationships with, *inter alia*, Nielsen;

c. An injunction prohibiting CCR from using Kinetiq's confidential information for Kinetiq's detriment, including by using such information to obtain contracts with Nielsen and any other third parties;

d. A declaration that Kinetiq does not infringe any valid or enforceable claim of the '037 patent;

e. A declaration that the '037 patent is invalid;

f. Contractual attorneys' fees, incidental and consequential damages;

g. Punitive and exemplary damages for tortious interference;

h. Such further relief as the Court may determine.

Respectfully submitted,

MCKEE, VOORHEES & SEASE, PLC

Dated: July 22, 2026 By:*/s/Glenn Johnson*
Glenn Johnson (AT0003856)
1800 First Avenue NE, Suite 200A
Cedar Rapids, Iowa 52402
&
801 Grand Avenue, Suite 3200
Des Moines, IA 50309-2721
Telephone: 515-288-3667
Facsimile: 515-288-1338
Email: Glenn.Johnson@ipmvs.com
Email: mvslit@ipmvs.com


COZEN O'CONNOR, P.C.

James A. Gale (pro hac vice forthcoming)
JGale@cozen.com
200 South Biscayne Blvd., Suite 3000
Miami, FL 33131
305-358-1991

Scott Penner (pro hac vice forthcoming)
SPenner@cozen.com
12255 El Camino Real, Suite 150
San Diego, CA 92130
619-685-1724

Owen Healy (pro hac vice forthcoming)
OHealy@cozen.com
1650 Market Street, Suite 2800
Philadelphia, PA 19103
215-701-8192

**VERIFICATION**

I, _____, verify under penalty of perjury as provided in 28 U.S.C. § 1746 that the facts set forth in the foregoing Verified Complaint are true and correct, and that allegations made under "information and belief" are made in good faith.

Executed on: _____

29